| | | |
|---|---|---|
| | AUSA: John J. McCormack, IV | Telephone: (202) 262-7011 |
| AO 106 (Rev. 04/10) Application for a Search Warrant | Special Agent: Steve Warren | Telephone: (313) 300-4419 |

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Michigan

| | | |
|---|---|---|
| In the Matter of the Search of | ) | Case: 2:20-mc-50281 |
| *(Briefly describe the property to be searched* | ) | Judge: Lawson, David M. |
| *or identify the person by name and address)* | ) Case No. | Filed: 02-20-2020 |
| INFORMATION ASSOCIATED WITH | ) | IN RE:SEALED MATTER(SW)(MLW) |
| EMILOUWS@GMAIL.COM, THAT IS STORED AT | ) | |
| PREMISES CONTROLLED BY GOOGLE, LLC | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- [x] evidence of a crime;
- [ ] contraband, fruits of crime, or other items illegally possessed;
- [ ] property designed for use, intended for use, or used in committing a crime;
- [ ] a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347 | Health Care Fraud |
| 18 U.S.C. § 1349 | Conspiracy to Commit Health Care Fraud |

The application is based on these facts:

See attached AFFIDAVIT.

- [ ] Continued on the attached sheet.
- [ ] Delayed notice _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Steve Warren
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: February 20, 2020
_____

_____
*Judge's signature*

City and state: _____

Hon. Anthony P. Patti      U. S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>INFORMATION ASSOCIATED WITH EMILOUWS@GMAIL.COM, THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE, LLC | Case No.<br><br>**<u>Filed Under Seal</u>** |

**AFFIDAVIT IN SUPPORT OF**
**<u>AN APPLICATION FOR A SEARCH WARRANT</u>**

I, Steven Warren, being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain account, emilouws@gmail.com (the "Target Account"), that is stored at premises controlled by Google, LLC ("Google"), an electronic mail ("email") provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications)

further described in Section I of Attachment B.  The government previously served a preservation request to Google for the Target Account.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent employed by the United States Department of Health and Human Services ("HHS"), Office of Inspector General ("OIG"), Office of Investigations. I have been so employed since July 2010 and am currently assigned to the Detroit Field Office of HHS-OIG. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

3.      Since becoming a Special Agent with HHS-OIG, my duties and responsibilities have included conducting investigations, audits, and inspections in connection with the administration and enforcement of laws, regulations, orders, contracts, and programs in which HHS is, or may be, a party of interest. I also perform other duties on behalf of the Secretary of HHS. My chief responsibility is the investigation of fraud involving Federal Health Care Programs. As a Special Agent with HHS-OIG, I have received basic criminal investigator training as well

as specialized training in the investigation of fraud and financial crimes.

Previously, I was employed as a Special Agent with the Ohio Attorney General's

Office, Medicaid Fraud Control Unit for approximately two years.

4.    Over approximately the last twelve years, my primary responsibility

has been the investigation of criminal fraud against the federally-funded health

care programs commonly known as Medicare and Medicaid. These investigations

have included individuals, organizations, and businesses that have violated federal

laws, including, but not limited to, Title 18, United States Code, Section 1347

(Health Care Fraud), Title 18, United States Code, Section 287 (False, Fictitious,

or Fraudulent Claims), Title 18, United States Code, Section 1349 (Conspiracy to

Commit Health Care Fraud), Title 18, United States Code, Sections 1956, 1957

(Money Laundering), Title 42, United States Code, Sections 1320a-7(b)(1)(A) and

1320a-7(b)(2)(A) (Payment or Receipt of Health Care Kickbacks), and Title 18,

United States Code, Section 371 (Conspiracy to Pay or Receive Illegal

Remunerations). In connection with investigating these offenses, I have

participated in the execution of search warrants for documents and other evidence

in cases involving violations of these offenses.

5.    I have knowledge of the facts set forth in this affidavit as a result of

my participation in the investigation, as well as information provided to me by

3

other law enforcement agencies, including the Federal Bureau of Investigation

("FBI"). Information pertinent to this investigation was also provided by NCI

AdvanceMed, the current unified program integrity contractor in Michigan for

HHS responsible for performing investigations and audits designed to protect the

Medicare program ("Medicare") from fraud, waste, and abuse.  This affidavit is

intended to show merely that there is sufficient probable cause for the requested

warrant and does not set forth all of my knowledge about this matter.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is

"a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§

2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the

United States that has jurisdiction over the offense being investigated."  18 U.S.C.

§ 2711(3)(A)(i).

## RELEVANT STATUTES

7.      Title 18, United States Code, Section 1347, prohibits health care

fraud.  Whoever knowingly and willfully executes, or attempts to execute, a

scheme or artifice—

(1)      to defraud any health care benefit program; or

4

(2)     to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

8.     Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

9.     Title 18, United States Code, Section 371 provides that it is a criminal offense "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose."

10.    Title 18, United States Code, Section 1343, prohibits wire fraud: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings,

5

signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

11.     Title 18, United States Code, Section 1349, provides that any person who attempts or conspires to commit health care fraud or wire fraud, shall be subject to the same penalties as those proscribed in those statutes.

## THE MEDICARE PROGRAM

### 1.     Generally

12.     Medicare is a federally funded health care program providing benefits to persons who are over the age of sixty-five or disabled.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the HHS.  Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

13.     Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

14.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).  Medicare Part B helps pay the cost of physician services, medical

equipment and supplies, and other health services and supplies not paid for by Part

A.

15.     Specifically, Medicare Part B covers medically necessary physician

office services, including the ordering of durable medical equipment ("DME") such

as arm, leg, back, and neck braces.

16.     By becoming a participating provider in Medicare, enrolled providers

agree to abide by the policies and procedures, rules, and regulations governing

reimbursement.  To receive Medicare funds, enrolled providers, together with their

authorized agents, employees, and contractors, are required to abide by all

provisions of the Social Security Act, the regulations promulgated under the Act,

and applicable policies, procedures, rules, and regulations issued by CMS and its

authorized agents and contractors.  Health care providers are given and provided

with online access to Medicare manuals and services bulletins describing proper

billing procedures and billing rules and regulations.

17.      Health care providers can only submit claims to Medicare for

reasonable and medically necessary services that they rendered.

18.     Medicare regulations require health care providers enrolled with

Medicare to maintain complete and accurate patient medical records reflecting the

medical assessment and diagnoses of their patients, as well as records documenting

7

actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician.  Medicare requires complete and accurate patient medical records so that Medicare may verify that the services were provided as described on the claim form.  These records are required to be sufficient to permit Medicare, NCI AdvanceMed and other contractors, to review the appropriateness of Medicare payments made to the health care provider.

### 2.    Telemedicine

19.    Telemedicine provides a means of connecting patients to doctors by using telecommunications technology, such as the internet or the telephone, to interact with a patient.

20.    Telemedicine companies provide telemedicine services to individuals by hiring doctors and other health care providers.  Telemedicine companies typically pay doctors a fee to conduct consultations with patients.

21.    Medicare Part B covered expenses for specified telehealth services if certain requirements were met.  These requirements include that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified medical facility – not at

a beneficiary's home – during the telehealth consultation with a remote

practitioner.

22.     However, the Medicare regulations regarding telehealth concern only

payment for telehealth consultation services and do not prohibit the order/referring

of DME where the consultation itself is not billed to Medicare.

### 3.     Orthotics

23.     Orthotic devices, or orthoses, are DME items that are applied to the

outside of the body to support a body part.  They are commonly referred to as

"braces."  Examples of orthotic devices include back braces, knee braces, ankle

braces, wrist/hand supports, and arm/shoulder supports.

24.     According to the CMS website, CMS.gov, Section 1847(a)(2) of the

Social Security Act defines Off-The-Shelf ("OTS") orthotics as those orthotics,

covered by the Act, which require minimal self-adjustment for appropriate use and

do not require expertise in trimming, bending, molding, assembling, or

customizing to fit to the individual.  Orthotics that are currently paid under the Act

and are described in the Act are leg, arm, back, and neck braces.  The Medicare

Benefit Policy Manual (Publication 100-2), Chapter 15, Section 130 provides the

longstanding Medicare definition of "braces."  Braces are defined in this section as

"rigid or semi-rigid devices which are used for the purpose of supporting a weak or

deformed body member or restricting or eliminating motion in a diseased or injured part of the body."

25.     To receive reimbursement from Medicare for items such as OTS orthotics, a DME supplier is required to submit a claim, either electronically or in writing, through standard forms, either the Form CMS-1500 or UB-92.  Both of these claim forms require important information, including: (a) beneficiary's name and identification number; (b) the name and identification number of the referring/ordering provider who ordered/prescribed the OTS orthotics; (c) the health care benefit item that was provided or supplied to the beneficiary; (d) the billing codes for the specified item; and (e) the date upon which the item was provided or supplied to the beneficiary.

26.     Before submitting a claim to Medicare, a DME supplier must have the following on file:  a dispensing order, written order, some type of certificate of medical necessity, and information from the treating physician concerning the patient's condition and diagnosis.  The documentation must be maintained in the supplier's files and pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), Medicare providers are required to retain required documentation for six years from the date of its creation.  A supplier must have a hard copy,

faxed, or electronic order in their records before the supplier can submit a claim for payment to Medicare.

27.     A Local Coverage Determination ("LCD") is a decision made by a Medicare Contractor on whether a particular service or item is reasonable and necessary, and therefore covered by Medicare within the specific region the contractor oversees.  See §1869(f)(2)(B) of the Social Security Act.

28.     According to LCD L33318, in place nationally for services performed on or after October 1, 2015, knee braces, including code L1851, require an examination of the patient.  The LCD states that knee braces are medically necessary only where knee instability is documented by an in-person examination of the beneficiary and objective description of joint laxity (*e.g*., varus/valgus instability, anterior/posterior Drawer test).  Claims are not reasonable and necessary if only pain or a subjective description of joint instability is documented.

29.     According to LCD L33790, back braces, including code L0651, are covered only when they are ordered: (1) to reduce pain by restricting mobility of the trunk; (2) to facilitate healing following an injury to the spine or related soft tissues; (3) to facilitate healing following a surgical procedure on the spine or related soft tissue; or (4) to otherwise support weak spinal muscles and/or a deformed spine.

## RELEVANT ENTITIES

### *Dr. Emilio Berrios-Antuna*

30.     Dr. Emilio Berrios-Antuna ("BERRIOS-ANTUNA") is a licensed physician residing in Sterling Heights, Michigan, specializing in family practice.

31.     Medicare records indicate that BERRIOS-ANTUNA has been an enrolled provider with Medicare dating back to at least April 1, 2008, and as such, has certified to Medicare that he would comply with all Medicare rules and regulations, including that he would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare.

### *RediDoc*

32.     RediDoc is a telemedicine company located in Scottsdale, Arizona. According to corporate records filed with the Arizona Corporation Commission, Stephen Luke is listed as the manager and registered agent of RediDoc.

### *Quivvy Tech Corp.*

33.     Quivvy Tech Corp. ("Quivvy") is a telemedicine company located in Boca Raton, Florida.

## INVESTIGATIVE BACKGROUND

34.     In late 2019, the FBI and HHS-OIG initiated an investigation into BERRIOS-ANTUNA in connection with an ongoing nationwide investigation into

the telemedicine industry.  This investigation regarding BERRIOS-ANTUNA

focused on the submission of false and fraudulent claims to Medicare for DME

products that were medically unnecessary and/or not eligible for Medicare

reimbursement.

35.     As explained in more detail below, BERRIOS-ANTUNA never spoke

to, or examined, the beneficiaries and only reviewed limited, vague, and usually

incorrect information that was provided to him from RediDoc. BERRIOS-

ANTUNA would then refer multiple DME products for each Medicare beneficiary

that were often medically unnecessary and/or not eligible for Medicare

reimbursement.

## <u>PROBABLE CAUSE</u>

36.     Probable cause is established by statements from BERRIOS-

ANTUNA, Medicare beneficiaries and other witnesses, Medicare data, emails,

phone records, written orders for DME products and financial records.  This

evidence demonstrates that the DME certified by BERRIOS-ANTUNA was

medically unnecessary and/or not eligible for Medicare reimbursement but

nonetheless billed to Medicare.  Finally, the evidence also shows BERRIOS-

ANTUNA used the Target Account to carry out these crimes.

## A. MEDICARE DATA

37. Medicare claims data demonstrates that from October 5, 2018 until October 10, 2019, BERRIOS-ANTUNA was listed as the referring physician on approximately 8,000 claims for DME products for approximately 3,000 Medicare beneficiaries. These referrals for DME by BERRIOS-ANTUNA led to approximately $9.4 million in billings to Medicare, and Medicare paying DME suppliers approximately $5 million. BERRIOS-ANTUNA's referrals for DME increased more than 2000% (based on paid amount to DME suppliers) from 2017 to 2019.

38. From January 1, 2017 until October 10, 2019 the top five DME products referred by BERRIOS-ANTUNA to Medicare beneficiaries were as follows:

- Code L1851 (Knee orthosis):

| Beneficiaries | Claims | Amt. Submitted | Amt. Paid |
| --- | --- | --- | --- |
| 1,825 | 2,984 | $3,517.391.69 | $1,936,407.04 |

- Code L0650 (Lumbar-sacral orthosis):

| Beneficiaries | Claims | Amt. Submitted | Amt. Paid |
| --- | --- | --- | --- |
| 1,757 | 1,812 | $2,669,616.37 | $1,338,874.62 |

- Code L3960 (Shoulder elbow wrist hand orthosis):

14

| Beneficiaries | Claims | Amt. Submitted | Amt. Paid |
|---|---|---|---|
| 1,481 | 1,545 | $1,340,146.11 | $738,701.26 |

- Code L1971 (Ankle foot orthosis):

| Beneficiaries | Claims | Amt. Submitted | Amt. Paid |
|---|---|---|---|
| 633 | 834 | $569,942.07 | $303,147.00 |

- Code L2397 (addition to lower extremity orthosis, suspension sleeve):

| Beneficiaries | Claims | Amt. Submitted | Amt. Paid |
|---|---|---|---|
| 1,922 | 3,117 | $493,974.12 | $275,906.64 |

39.     Medicare claims data indicates that as of October 10, 2019, BERRIOS-ANTUNA has not billed Medicare Part B for covered expenses for specified telehealth services.

**B.     BERRIOS-ANTUNA**

**1. STATEMENT**

40.     On or about October 30, 2019, agents interviewed BERRIOS-ANTUNA.  He admitted that he started in telemedicine by working with RediDoc in November 2018.  His friend encouraged him to apply.  BERRIOS-ANTUNA recalled that he called RediDoc, filled out an application and began working with the company after they checked his medical license.  BERRIOS-ANTUNA stated he also began working with another telemedicine company in December 2018,

15

which he believed was called DMERX, and another called Quivvy Tech in January
2019.

41.     BERRIOS-ANTUNA explained the telemedicine companies sent him
patients via an online portal, which included the patient information, such as their
date of birth and medical conditions, on a patient "triage" form.  Usually the
patients had Medicare.  He believed the triage form was filled out by medical
assistants, but acknowledged that he did not know the background of the
individuals who were collecting and inputting the information and recalled an
instance where a basic medication was misspelled.

42.     BERRIOS-ANTUNA stated he was paid $50 per consult or call.  He
believed he completed 10-40 consults a day.   He estimated that he spoke to less
than 10% of patients on the phone. When he did not speak to a patient he indicated
that he relied solely on the patient triage information to make his medical decision.
BERRIOS-ANTUNA stated he would order back and knee braces for patients but
never ordered a lot of braces at once for a patient.  BERRIOS-ANTUNA admitted
that he denied very few patients for braces.  In fact, he was unsure whether he was
paid for a consult that ended in a denial because they were so infrequent.  He
indicated that he did not know where the order for the DME product went after he
signed it.

43.     BERRIOS-ANTUNA stated he did not have any discussions with any of the telemedicine companies about policies for prescribing braces.  Likewise, he stated he did not really have knowledge of the Medicare rules and regulations and was not familiar with the telemedicine requirements.  If he was unsure of something, he would contact the telemedicine company. BERRIOS-ANTUNA stated he was not aware that a face-to-face exam was required in order to prescribe a knee brace.  However, he explained that since he was only licensed in Michigan, he made sure to only check the patient's address to ensure they were in Michigan.

44.     In general, BERRIOS-ANTUNA explained that he prescribed braces, maintenance medications and pain creams, like lidocaine, with RediDoc. He admitted that he never spoke with any patients from RediDoc and made his medical decision to accept or deny the prescription solely based on the patient information that was provided in the system.  He indicated that he had not received any patient referrals from RediDoc since April 10, 2019.[1]

45.     BERRIOS-ANTUNA indicated he spoke to about 10% of the patients that were referred to him by Quivvy.

---

[1] On April 9, 2019, the United States Department of Justice and federal partners announced a national telemedicine and DME takedown that resulted in charges against 24 individuals responsible for over $1.2 billion in losses to the Medicare program.

17

## 2. WRITTEN ORDERS OBTAINED FROM REDIDOC

46.    As discussed in more detail below in ¶ 93, agents obtained emails

between RediDoc employees and BERRIOS-ANTUNA from the District of New

Jersey United States Attorney's Office ("NJ USAO"), who are conducting an

investigation into RediDoc.  The NJ USAO obtained the RediDoc emails pursuant

to a search warrant signed by Hon. Leda Dunn Wettre, U.S. Magistrate Judge for

the District of New Jersey, on May 7, 2019.  The email production from the NJ

USAO included written orders for DME referrals by BERRIOS-ANTUNA for

Medicare beneficiaries.

47.    The written orders include the patient's insurance information.  This

information is listed after a section identifying "Insurance Name And ID# and

Medicare#."

48.    Every written order for DME is electronically signed by BERRIOS-

ANTUNA and includes the certification that, "I, Emilio Berrios-Antuna, M.D.,

verify and confirm this order for the above named patient, and certify that I have

personally performed the assessment of the patient for the prescribed treatment and

device and verify that it is reasonably and medically necessary, according to

accepted standards of medical practice within the community, for this patient's

medical conditions."

49.    The written orders also contain an attached attestation where BERRIOS-ANTUNA certified that he "established a valid prescriber-patient relationship with the Patient," and that he is aware of, and his practice conforms to, applicable State laws as they relate to the requirements for telemedicine and establishing a valid prescriber-patient relationship.

50.    The NJ USAO production of RediDoc emails included written orders electronically signed by BERRIOS-ANTUNA for approximately 233 Medicare beneficiaries in connection with approximately 610 claims for DME products that were ultimately billed to Medicare.  The Medicare data demonstrates that these written orders for DME by BERRIOS-ANTUNA with RediDoc led to the submission of approximately $711,790.69 in claims to Medicare for reimbursement and Medicare paying $369,532.97 to DME suppliers from November 23, 2018 to April 9, 2019.

C.    **STATEMENTS BY MEDICARE BENEFICIARIES AND OTHER WITNESSES**

1.    *V.W.*

51.    On October 28, 2019, agents interviewed Medicare beneficiary V.W., who indicated he/she received a cold-call on a Saturday night in December 2018 from a man who claimed he was from Medicare.  The call was approximately five

to ten minutes long.  The man told V.W. he/she was eligible for a free knee brace.

V.W. had recently spoken to his/her primary care physician who said a knee brace

would not help V.W. but instead recommended a topical cream for V.W.'s knee.

V.W. told the man on the phone of this recent conversation and said he/she was

only interested in topical cream instead of a knee brace.  The man agreed to send

him/her the cream.

52.     V.W. stated that a couple of days later, he/she received a package in

the mail from a DME supplier containing two knee braces, two wrist braces, a back

brace and other products.  V.W. immediately returned the products to the DME

supplier and contacted Medicare.

53.     V.W. indicated he/she never spoke to a physician about the braces and

had never heard of BERRIOS-ANTUNA.

54.     Medicare claims data indicates BERRIOS-ANTUNA was the

referring provider on claims for V.W on December 27, 2018 for a left and right

knee brace (L1851), right and left knee suspension sleeves (L2397), a back brace

(L0650), and a shoulder elbow wrist brace (L3960) .  Medicare was billed

$4,728.60 for the braces and paid $0.00 in connection with claims.

### 2.      D.B on behalf of C.B.

55.      On January 6, 2020, agents interviewed D.B. on behalf of Medicare beneficiary C.B.  D.B. is C.B's adult child.  C.B. has suffered from Alzheimer's for the past five years.  D.B. reported C.B. has been incoherent since the onset of Alzheimer's and has been getting progressively worse.  D.B. stated C.B. does not have any back or knee problems and would have no use for knee braces, compression sleeves or a back brace.  C.B. has no physical ailments.  Neither C.B.'s primary care physician nor psychiatrist have ever recommended any type of brace for C.B.

56.      D.B. recalled two boxes that said "medical devices" were delivered to C.B. via the mail.  D.B. knew C.B. would not order anything and they were not expecting medical devices.  D.B. stated C.B. is incapable of ordering anything for himself/herself and does not use the telephone.  D.B. did not open the boxes and just sent them back.

57.      D.B. has never heard of BERRIOS-ANTUNA and denied C.B. would have ever spoken to a physician over the phone or have any direct interaction with a physician.  C.B. does not have the mental capacity to request braces.

58.      Medicare claims data indicates BERRIOS-ANTUNA was the referring provider on claims for C.B. on January 22, 2019 for a left and right knee

21

brace (L1851), left and right knee suspension sleeves (L2397), and a back brace (L0650). Medicare was billed $3,950.73 for the braces and paid $1,159.44 in connection with claims.

59.    The written orders for the braces for C.B. are electronically signed by BERRIOS-ANTUNA on January 16, 2019. According to the order for the back brace, "[C.B.] has inquired about utilizing orthotic bracing for [his/her] current conditions; [his/her] chief complaint at the time of this assessment is: Back pain." C.B. has described the pain as "aching and sharp," and states that it was a "10 out of 10." Additionally, C.B. has had chronic pain for over 6 years. Under the "Assessment/Plan" portion of the order, it states that "I explained the benefits of this equipment and [he/she] is interested in the treatment."

60.    Similarly, the order for the knee braces and suspension sleeves indicates that, "[C.B.] is currently experiencing knee pain" and "would like to discuss having a knee brace prescribed" for pain. C.B. has described the pain as "aching and sharp," and states the pain is a "constant 10" on a scale of 1-10. Under the "PLAN" portion of the order, it states that "I explained the benefits of the brace (L1851/L2397), which is an alternative, non-invasive method to potentially relieve [his/her] pain. [C.B.] has agreed to this plan. Based on our interaction, I have determined it is medically necessary and appropriate to

22

prescribe treatment today."   With respect to "FOLLOW UP", the order reads, "I

provided [C.B.] with our telephone number to schedule a follow up brace

evaluation or if [his/her] conditions deteriorates.  I recommended [him/her] to

consult with an orthopedic specialist to discuss and control [his/her] pain

management regimen."

### 3.     F.B. and K.B.

61.    On January 16, 2020, and on February 11, 2020, agents interviewed

Medicare beneficiary F.B. and his/her spouse K.B.  K.B. indicated that F.B. has

some memory issues.  F.B. stated he/she sustained a back injury during the

Vietnam War and currently receives pain shots for his/her back.  F.B. has no

medical issues with his/her knees, ankles or feet.  F.B. denied having surgery on

his/her ankles, having arthritis in his/her knee or having chronic instability of the

knee.  Furthermore, F.B. stated he/she may be borderline diabetic but does not take

any medication for diabetes.

62.    F.B. recalled braces just showed up one day and were delivered to

their house.  F.B. wasn't sure when the braces arrived but thought it was about a

year ago.  F.B. called Medicare after receiving the braces because he/she did not

need them.  The braces were kept for a while and were recently thrown away.

63.     F.B. did not remember calling a phone number about braces or speaking to a doctor on the phone or to anyone about pain in his/her joints.  F.B. has never heard of BERRIOS-ANTUNA.

64.     Medicare claims data indicates BERRIOS-ANTUNA was the referring provider on claims for F.B. on February 28, 2019 for a left and right knee brace (L1851), left knee suspension sleeve (L2397), a right shoulder brace (L3960), left and right ankle foot brace (L1971) and a right foot heel stabilizer (L3170).  Medicare was billed $4,519.72 for the braces and paid $2,815.89 in connection with claims.

65.     The written orders for the braces for F.B. are electronically signed by BERRIOS-ANTUNA on February 24, 2019.  Collectively, according to the orders, F.B. is currently experiencing right shoulder pain, pain in both knees, and pain in both ankles.  The orders indicate F.B. has surgical history on his/her ankles, currently takes diabetes medication, has had knee pain "for years" and "constant" ankle pain "for years", and describes the pain as a 10 "on a scale of 1-10."   The written orders for knee braces indicates, "I explained the benefits of this equipment and [he/she] is interested in the treatment."

66.     Similarly, the written order for the right ankle brace and heel stabilizer states, "I explained the benefits of the brace(s), which is an alternative, non-

invasive method to potentially relieve [his/her] pain.  [F.B.] is interested in this treatment.  Based on our interaction, I have determined it is medically necessary and appropriate to prescribe treatment today."   With respect to "FOLLOW UP", the order reads, "I provided [F.B.] with our telephone number to schedule a follow up brace evaluation, or if needed for questions.  I recommended [F.B.] to consult with an orthopedic physician to discuss and control [his/her] pain management regimen."

### 4.     *R.K. on behalf of B.J.*

67.     On January 21, 2020 agents interviewed R.K. about Medicare beneficiary B.J.   B.J. has Down syndrome and lives at a facility that R.K. runs.  The facility is staffed 24 hours a day when clients are present.  B.J. has lived at the facility since October 1, 2018 and requires 24-hour supervision.  R.K. explained that besides having Down syndrome, B.J. is fine physically.  B.J. had knee surgery years ago before coming to the facility, but B.J. does not seem to have any problems with his/her knees.  B.J. is able to walk and had job training that required him to lift fishing bait.

68.     R.K. reported B.J. tells lies quite a bit and admits to lying.  B.J. has a cellular telephone and has conversations on it by himself.

69.     Someone accompanies B.J. when he/she goes to the doctor.  R.K. took B.J to Dr. Karman Zakaria's office for annual physicals on November 26, 2018, and on December 9, 2019.  During the December 2019 visit, B.J. told Dr. Zakaria that his/her knee hurt.  Dr. Zakaria had B.J. bend his/her knee and then told B.J. that his knee was fine.  Dr. Zakaria has never recommended that B.J. get braces for his/her knees, back or shoulder.  B.J. does not see any other doctors or specialists. B.J. does not take any over the counter or prescription pain medication, has never been diagnosed with arthritis or have chronic knee instability.

70.     R.K. recalled two boxes of braces were delivered to the facility for B.J. around January 2019.  The boxes were taken from B.J. and he/she never wore them.  R.K. recalled seeing knee braces and other braces in the boxes.  R.K. tried unsuccessfully to return the braces and wound up throwing the braces away.  B.J. told R.K. someone called him/her about the braces.  R.K. stated B.J. was not in the position to have discussions on the phone with a doctor or anyone else about his medical condition.  B.J. would not be able to come up with answers to questions about his/her medical condition but could answer leading questions.  R.K. stated anyone speaking to B.J. on the telephone would be aware that B.J. was cognitively impaired and know that B.J. was a reduced capacity person.  R.K. believed that it was doubtful a doctor could explain the benefits of a brace to B.J. over the phone.

26

71.    Medicare claims data indicates BERRIOS-ANTUNA was the referring provider on claims for B.J. on January 10, 2019 for a left and right knee brace (L1851), left and right knee suspension sleeve (L2397), a right shoulder brace (L3960) and a back brace (L0650).  Medicare was billed $4,728.60 for the braces and paid $2,151.95 in connection with claims.

72.    The written orders for the braces for B.J. are electronically signed by BERRIOS-ANTUNA on January 7, 2019.  According to the orders, B.J. is currently experiencing pain in both knees, back pain that is aggravated by walking and lifting things, and right shoulder pain.  Collectively, the orders indicate B.J. had knee surgery 6 months ago, has had knee pain for more than 5 years due to arthritis, takes Tylenol and shots for pain, and previously took prescription and over the counter pain medication.

73.    With respect to "PLAN", the written order for knee braces indicates, "I explained the benefits of the brace (L1851/L2397), which is an alternative, non-invasive method to potentially relieve [his/her] pain. [B.J.] is agreeable to this treatment plan."  The order for the back brace states something to the same effect.  The order for the knee braces also states, "I recommended [B.J.] to schedule a follow up appointment if his/her condition deteriorates.  [He/she] should see [his/her] orthopedic physician to discuss [his/her] pain management."

27

### 5.    D.H.

74.    On January 24, 2020, agents spoke to Medicare beneficiary D.H., who indicated he/she had lower back surgery about 3 years ago and received a back brace from the hospital.  D.H. also had bypass surgery through his/her legs and received a leg brace through the hospital.

75.    About a year after the surgery, D.H. started having lower back pain and ordered a "Dr. Ho" belt after seeing a television commercial and calling a phone number.  The representative on the phone tried to get him to agree to receive more braces, but D.H. only wanted the "Dr. Ho" belt and refused the other braces. During the call, which was approximately 30 minutes, D.H. said that he/she spoke to a nurse and physician.  D.H. received the "Dr. Ho" belt but it did not work.

76.    Shortly after making the call for the "Dr. Ho" belt, D.H. began receiving multiple calls for other braces.  During the calls, D.H. confirmed having pain but denied wanting other braces.  About three to four months after the calls, D.H. began receiving braces in the mail including wrist, upper back and leg braces for below the knee.

77.    D.H. has never heard of BERRIOS-ANTUNA and does not recall having a conversation with a medical professional in February 2019 about braces.

78.    Medicare claims data indicates BERRIOS-ANTUNA was the referring provider for claims for D.H. on February 12, 2019  for a left and right knee brace (L1851), left and right knee suspension sleeve (L2397), a right shoulder brace (L3960) and a back brace (L0650).  Medicare was billed $4,728.60 for the braces and paid $3,118.98 in connection with claims.

79.    The written orders for the braces for D.H. are electronically signed by BERRIOS-ANTUNA on February 12, 2019.  According to the orders, D.H. is currently experiencing pain in both knees, back pain, which is aggravated by walking for a long period of time and due to arthritis, and right shoulder pain, which started over 10 years ago due to arthritis and is aggravated by holding objects for a long time.  Collectively, the written orders indicate D.H. takes prescription and over-the-counter pain medication, including Oxycodone.

80.    Agents reviewed the written orders for DME electronically signed by BERRIOS-ANTUNA with D.H. and D.H. indicated he/she never received two knee braces and had approximately seven surgeries in the last five years, although the written orders indicated he/she had no surgical history.  D.H. also confirmed he/she had arthritis and had a fear of falling but indicated he/she would not tell anyone that over the telephone.  D.H. denied having a deformed spine or shoulder

29

issues as indicated in the written orders.  D.H. denied taking Oxycodone as reflected in the written orders.

81.    With respect to "PLAN," the written order for knee braces indicates, "I explained the benefits of the brace (L1851/L2397), which is an alternative, non-invasive method to potentially relieve [his/her] pain. [D.H.] is agreeable to this treatment plan.  I have determined that it is medically necessary and appropriate to prescribe this device to help support muscles and reduce mobility and increase stabilization."  The order for the back brace states something to the same effect. The order for the knee braces also states, "I recommended [D.H.] to schedule a follow up appointment if his/her condition deteriorates.  [He/she] should see [his/her] orthopedic physician to discuss [his/her] pain management."

### 6.    *CW-1 – Cooperating Witness*

82.    CW-1 is a physician in New Jersey.  On April 5, 2019, CW-1 was indicted on one count of Conspiracy to Commit Health Care Fraud in violation of Title 18, United States Code, Section 1349 and three counts of Health Care Fraud in violation of Title 18, United States Code, Section 1347 in the District of New Jersey in connection with his/her telemedicine practice at other telemedicine companies besides RediDoc and Quivvy.  On September 19, 2019, CW-1 pled guilty to the count of Conspiracy to Commit Health Care Fraud.

83.     CW-1 has been interviewed multiple times by law enforcement agents in New Jersey. In substance, CW-1 indicated he/she began working as a telemedicine doctor for RediDoc in the summer of 2017 and continued with RediDoc for about 5 to 6 months.  CW-1 was paid $25 per consult at RediDoc and received payments through bill.com.  On the day of payment, CW-1 would receive a notification from bill.com.

84.     CW-1 stated when he/she worked at RediDoc, patients would call him/her to complain that they received braces prescribed by him/her that they did not want.  In response, CW-1 would email Stephen Luke, the owner of RediDoc, to see what was going on.  CW-1 told Luke that RediDoc needed to vet the patients before they send the patient to him/her to make sure the patient actually wanted the brace. CW-1 indicated he/she quit working at RediDoc because he/she did not have a good feeling about their business.  CW-1 stated RediDoc was creating fraudulent DME orders using pre-populated boxes in the order form.

## C.    FINANCIAL RECORDS

85.     Bank records were obtained from Chase Bank via grand jury subpoena for BERRIOS-ANTUNA's accounts.  An account ending in -5640 was opened at Chase on or about June 8, 2011.   BERRIOS-ANTUNA was the only authorized signer on the account.  From November 19, 2018, through April 24,

2019, twelve checks from RediDoc were deposited into the account totaling $69,110.00.

86.     Another account ending in -2335 was opened at Chase on or about March 17, 2009, titled "Berrios Antuna Family Practice PC". The authorized signers were BERRIOS-ANTUNA and Jacqueline Garcia. About two months after the opening, Ms. Garcia was subsequently removed as an authorized signor on the account. From October 3, 2018 until November 25, 2019, the account received twenty-eight automatic deposits from Quivvy totaling $92,950.00.

### PROBABLE CAUSE REGARDING
### USE OF THE SUBJECT ACCOUNTS
### TO EXECUTE THE SCHEME

87.     As previously articulated, during the course of the investigation, the NJ USAO provided emails from some RediDoc employees. The emails were between BERRIOS-ANTUNA and some RediDoc employees, and between some RediDoc employees about BERRIOS-ANTUNA. The NJ USAO obtained the RediDoc emails via a search warrant signed by Hon. Leda Dunn Wettre, U.S. Magistrate Judge for the District of New Jersey, on May 7, 2019. The warrant sought emails from tchavarria@redidoc.com ("Teresa Chavarria"), tzec@redidoc.com ("Trisha Zec") and vdn@redidoc.com.

88.     The emails demonstrate that BERRIOS-ANTUNA regularly used the Target Account to communicate with employees of RediDoc about many topics, including but not limited to the onboarding process, payments to BERRIOS-ANTUNA, his volume of patients from RediDoc and Quivvy, his desire to receive more patients, his concerns about committing fraud, and scheduling telephone calls with RediDoc employees.

89.     On April 19, 2018, BERRIOS-ANTUNA sent an email from the Target Account to Teresa Chavarria, with the subject "Permanent Telemedicine: Family Practice Job in Detroit, MI."   He wrote, in relevant part, that he would "like to apply to this position.  I am bilingual [sic] English and Spanish and I live in Michigan.  Attached is my resume.  Thanks."   The resume attached to the email for BERRIOS-ANTUNA lists his email as the Target Account and his phone number as (917) 450-1958 ("BERRIOS-ANTUNA cellular phone number").   The resume indicated that BERRIOS-ANTUNA has "profound knowledge of family medical practice," and "outstanding knowledge of pharmaceutical drugs and medical principles."

90.     On April 20, 2018, the Target Account received an email from Teresa Chavarria with the subject "RediDoc Virtual Doctor Network."   In the email, Chavarria wrote, in relevant part, that "RediDoc is excited about your interest in

33

joining our Virtual Doctor Network."  She also wrote that "some of the benefits

include….up to $30 Per [sic] visit."  The signature block on the email indicates

that the email was sent by Teresa Chavarria, Account Representative, RediDoc.

91.    On October 26, 2018, the Target Account received an email from

physicianonboarding@redidoc.com ("Physician Onboarding") with the subject

"RediDoc Physician Agreement."  Teresa Chavarria was copied on the email.  The

email states, in relevant part, that "RediDoc is very pleased to announce that you

have been approved to join our Virtual Doctor Network.  Please Click Here to Sign

[sic] our Physician Services Agreement."  The end of the email states, "If you have

any questions, please contact physicianonboarding@redidoc.com and a RediDoc

representative will contact you back as soon as possible."   The signature block on

the email indicates the email was sent by Physician Onboarding and lists the phone

number for Physician Onboarding as (602) 980-6753 ("Physician Support phone

number").

92.    A Short Form Physician Application ("Application") that was

electronically signed by BERRIOS-ANTUNA on October 26, 2018, was included

in the production of BERRIOS-ANTUNA emails from the NJ USAO.  The

application includes a section titled "Fraud Warning" that indicates in a number of

states, including Michigan, "any person who knowingly, and with intent to defraud

any insurance company or other person, files an application for insurance or statement of claim containing any materially false information, or, for the purpose of misleading, conceals information concerning any fact material thereto, may commit a fraudulent insurance act which is a crime in many states." The Application included a "Physician Non-Disclosure Agreement" ("Agreement") which indicates that "the Parties are contemplating into agreement for mutually beneficial business relationships connected with Physician's participation as an independent contractor in RediDoc's proprietary physician network, through which Physician will gain access to patients who are steered to participating network physicians, so they may be provided telehealth and/or telemedicine services." The agreement was electronically signed by BERRIOS-ANTUNA on October 26, 2018 and lists his email address as the Target Account and his phone number as the BERRIOS-ANTUNA cellular phone number. The Agreement was countered-signed on behalf of RediDoc by Stephen Luke, CEO.

93.   On October 26, 2018, the Target Account received an email from Physician Onboarding with the subject "RediDoc Payment Information." Teresa Chavarria was copied on the email. The email indicates, in relevant part, that "you will receive an invite from Bill.com in the near future requesting you to create an

account to set up your direct deposit information in order to receive payment from RediDoc.  Payments will be on the 5th and 20th day of each month."

94.     On October 26, 2018, the Target Account received an email from Physician Onboarding with subject "Re: RediDoc Test Patient" with records for a test patient for BERRIOS-ANTUNA to review through the "web portal."  On that same day BERRIOS-ANTUNA sent an email response to Physician Onboarding indicating that "I have followed your easy steps on your portal till the end.  I am so glad how intuitive is your portal [sic].  Thank you for the prompt responses and looking forward to start with real patients!"

95.     On November 5, 2018, BERRIOS-ANTUNA sent an email from the Target Account to Physician Onboarding with the subject "Re: Payment Information."  Teresa Chavarria was copied on the email.  BERRIOS-ANTUNA wrote, "Hello, What State [sic] has the highest volume in call?  I am planning on getting a second state license.  Your answer will help me decide which state I should choose."  On November 6, 2018, Physician Onboarding responded via email stating, "Hello Dr. Berrios, You have been set up in Bill.com in the third party site we use for compensation.  Some of our high volume states are VA, DC or NC.  Thank you!"

96.    On November 9, 2018, BERRIOS-ANTUNA sent an email from the Target Account to Physician Onboarding indicating that, "I have noticed that the number of patients assigned to me is very low.  What are the factors to increase the volume of patients assigned to me?"  That same day, Physician Onboarding responded to BERRIOS-ANTUNA's email and stated, in relevant part, that "volume varies month to month and state to state therefore the recommendation we provide to attain more volume would be acquiring multiple licenses."

97.    On November 16, 2018, BERRIOS-ANTUNA sent an email from the Target Account to Physician Onboarding asking, "Is it normal to not have received any patient [sic] in the last 2 weeks?  I am working with Quivvy as well and they send me patients on a daily basis.  I am just wondering if this how it works depending on the volume of calls."

98.    On December 17, 2018, the Target Account received an email from nmandic@redidoc.com ("Nada Mandic") stating, in relevant part, "Please note that Patient 1311859 would like to speak to you with regards to the products that you have prescribed.  The consult has been approved and signed by you on 11/30/2018 and you may access the records through your Dashboard.  The contact number is 231-425-6457."  The signature block on the email indicates that Nada Mandic is a "Medical Admin Assistant, Physician Support."

37

99.    On December 18, 2018 at 3:51 am, BERRIOIS-ANTUNA sent an email from the Target Account to Nada Mandic stating, "I came late and I was not sure if I could call the patient.  I looked at her record and they were Braces [sic] products.  Is it possible to find out why she wants to speak to me?  My schedule is hectic this week and I do come late each night.  I will try to reach her when I can.  Please call her back and find out what she is asking about."

100.    On December 18, 2018 at 8:11 am, the Target Account received an email from Nada Mandic with the Subject "Re: Patient ID 1311859."  Trisha Zec was copied on the email.  In the email, Mandic wrote that the "the patient has additional questions with regards to prescribed braces, and she would like to speak to the prescribing Physician.  Please note that we do understand you have a tight schedule that you have to follow, however, please reach out to the patient when you get the chance."

101.    On December 18, 2018 at 3:41 pm, BERRIOS-ANTUNA sent an email from the Target Account to Nada Mandic with the subject "Re: Patient ID 1311859." He stated that, "I called the patient and she is wondering how she got approved for the braces since she never called.  Can you confirm what is going on?  Please call the patient and assure to her that she made the call and that's why she

was routed to me.  She said she had no idea and might think it is fraud against Medicare.  Can you please update me on the case?"

102.   On December 18, 2018 at 10:49 pm, Nada Mandic sent an email to Trisha Zec and Physician Support stating, in relevant part, that "Dr. Antuna called us after sending this email, he advised that the patient would like to return the products and he said that he would like to be updated on this."

103.   On December 21, 2018, the Target Account received an email from Physician Support stating in relevant part that, "please note that you have consults assigned to you, kindly check your email to review."  The phone number for Physician Support was listed as (805) 613-7159 ("Physician Support phone number").  On that same day, BERRIOS-ANTUNA sent an email in reply from the Target Account and stated, in relevant part, that "I am doing my best to go over it all! I have been going through the audio recording of each patient to make sure they need what is displayed!  Am I the only dr [sic] assigned in Michigan?"   That same day, the Target Account received an email from Physician Support and Trisha Zec was copied on the email.  The email stated, in relevant part, "Please note that this email has been sent as a notification that you have consults assigned to you and we definitely understand that the process can take longer."

104. On December 19, 2018, the Target Account received an email from Physician Support stating, in relevant part, that RediDoc was "about to open the platform to start facilitating laboratory requests from consumers. It will initially be Cancer Screening Tests and we would like to check in with you if you would be interested in participating in the laboratory reqs program. The process will be the same for you to approve or decline and compensation is also $20/consult. Please advise."

105. On December 19, 2018, BERRIOS-ANTUNA sent an email from the Target Account to Physician Support in response stating, in relevant part that "I wish not to participate in this one." However, on April 5, 2019, BERRIOS-ANTUNA sent an email from the Target Account to Physician Support stating, in relevant part, "Can I try to be a part of the Cancer screening to get an idea what would I be doing? If I like it I'd keep it. Would that be ok?" In another email dated April 5, 2019 from the Target Account to Physician Support, BERRIOS-ANTUNA asked "what would be the consult rate for Cancer screening?" Physician Support responded and sent an email to the Target Account on April 5, 2019, stating, in relevant part that, "the compensation is $30 per connection."

106. On April 10, 2019, BERRIOS-ANTUNA sent an email from the Target Account to Physician Support with the Subject "DME fraudulent news"

stating, in relevant part, "Yesterday I saw on NBC a report about possible fraudulent practice of Telemedicine with durable medical equipment. Although I believe that RediDoc is far from that having all the regulations and monitoring I am noticing, how would you assure that RediDoc is conducting a professional and compliant operation? I am only looking for some piece of mind."

107.   On April 10, 2019, the Target Account received an email from Physician Support and Trisha Zec was copied. The email stated, in relevant part, "I have tried calling you, however was transferred to voicemail. Please advise when would be the best time for us to give you a call."

108.   Phone records relating to the BERRIOS-ANTUNA cellular phone number were obtained from Verizon Wireless ("Verizon") via grand jury subpoena. The records date back to December 28, 2018. The phone records document an incoming call to the BERRIOS-ANTUNA cellular phone number from the Physician Support phone number on April 10, 2019, lasting approximately 39 seconds.

109.   On April 15, 2019, at 9:30 am, BERRIOS-ANTUNA sent an email from the Target Account to Trisha Zec stating, in relevant part, "I am noticing that I am not having patients since last Thursday while the norm would be around 20

patients a day for the past 3-4 months.  I am surprised for this drop in volume.  Can you please let me know what is the issue here?"

110.   On April 15, 2019 at 11:53 am, Verizon phone records document an outgoing call from the BERRIOS-ANTUNA cellular phone number to Physician Support phone number lasting approximately 44 seconds.

111.   On April 15, 2019 at 12:03 pm, BERRIOS-ANTUNA sent an email from the Target Account to Trisha Zec stating, in relevant part, "I would like to talk to you as [sic] your convenience.  Please give me a call at (917) 450 1958."

112.   Later that evening, on April 15, 2019, the Target Account received an email from Trisha Zec stating, in relevant part, that "we are currently updating our systems and processes.  We will notify you when these modifications are complete, which we anticipate being within the next 10 days."

113.   On April 29, 2019, BERRIOS-ANTUNA sent an email from the Target Account to Trisha Zec asking, "Any updates on the date for RediDoc to be up again?"

114.   Verizon phone records document approximately 15 telephone calls between the BERRIOS-ANTUNA cellular phone number and the Physician Support phone number occurring between May 5, 2019 and July 25, 2019.

115.   Based on the information above, there is probable cause to believe the Target Account was used in a conspiracy to defraud Medicare and/or a scheme to defraud Medicare.  That is, the preceding information shows that BERRIOS-ANTUNA used the Target Account to communicate with members of RediDoc, including but not limited to, the onboarding process, payments to BERRIOS-ANTUNA, his volume of patients from RediDoc, his desire to receive more patients, his concerns about committing fraud, and scheduling telephone calls with RediDoc employees.

116.   On December 30, 2019, pursuant to 18 U.S.C. § 2703(f), the government sent Google a request to preserve all stored communications, records, and other evidence associated with the Target Account for 90 days.

117.   In general, an email that is sent to a Google subscriber is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Google's servers indefinitely.  Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time.

## SPECIAL INSTRUCTIONS REGARDING

## REVIEW OF SEIZED MATERIALS

118.   With respect to law enforcement's review of the seized material identified in Attachment B, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the seized material (collectively, the "Review Team") are hereby authorized to review, in the first instance, the seized material.

119.   If, during the review of the seized material, the review team finds potentially privileged materials, the review team will: (1) immediately cease its review of the potentially privileged materials at issue; (2) segregate the potentially privileged materials at issue; and (3) take appropriate steps to safeguard the potentially privileged materials at issue.  Nothing in this Instruction shall be construed to require the Review Team to cease or suspend review of all the seized material upon discovery of the existence of potentially privileged materials within a portion of the seized material.

## CONCLUSION

120.   Based on the forgoing, I request the Court issue the proposed search warrant.  Because warrants will be served on Google, who will then compile the

44

requested records at a time convenient to them, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

121.   Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

122.   I further request the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Steven Warren
Special Agent
HHS-OIG

45

Sworn to before me and signed in my

Presence and/or by reliable electronic means,

_____

Honorable Anthony P. Patti    February 20, 2020
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A</u>

### Property To Be Searched

This warrant applies to information associated with emilouws@gmail.com that is stored at premises owned, maintained, controlled, or operated by Google, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## ATTACHMENT B

### Particular Things To Be Seized

### I.      Information to be disclosed by Google

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f), Google is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all emails associated with the account from April 19, 2018 to July 25, 2019, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative

email addresses provided during registration, methods of connecting, log files, and

means and source of payment (including any credit or bank account number);

c.       The types of service utilized;

d.       All GSuite or Google Domain information stored on the account from

April 19, 2018 until July 25, 2019, by an individual using the account, including

but not limited to address books, contact and buddy lists, calendar data, pictures,

and files;

e.       All records pertaining to communications between Google and any

person regarding the account, including contacts with support services and records

of actions taken; and

f.       For all information required to be disclosed pursuant to this warrant,

the physical location or locations where the information is stored.


        Google is hereby ordered to disclose the above information to the

government within 14 days of the issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 18 U.S.C. § 1349 (conspiracy), 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 371 (conspiracy), those violations involving BERRIOS-ANTUNA and employees of RediDoc, including but not limited to Stephen Luke, Trisha Zec, Teresa Chavarria and Nada Mandic, and others, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Health care fraud;

(b) Wire fraud;

(c) Conspiracy to defraud the United States, or conspiracy to commit health care fraud;

(d) Medicare enrollment and communications with Medicare or employees or contractors affiliated with Medicare;

(e) All records that refer or relate to the referral of medical patients for durable medical equipment to RediDoc, physicians, or other providers;

(f) The billing of BERRIOS-ANTUNA's referrals for durable medical equipment by RediDoc;

(g) Communications by BERRIOS-ANTUNA or employees of RediDoc with Medicare beneficiaries;

(h) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(i) Evidence indicating the email account owner's state of mind as it related to the crime under investigation;

(j) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(k) The identity of the person(s) who communicated with the user ID about matters relating to health care fraud or wire fraud, including records that help reveal their whereabouts.

## <u>CERTIFICATE OF AUTHENTICITY OF</u>
## <u>DOMESTIC BUSINESS RECORDS</u>
## <u>PURSUANT TO FEDERAL RULE OF</u>
## <u>EVIDENCE 902(11)</u>

I, _____, attest, under penalties of perjury

under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that

the information contained in this declaration is true and correct.  I am employed by

Google, and my official title is _____.  I am a

custodian of records for Google.  I state that each of the records attached hereto is

the original record or a true duplicate of the original record in the custody of

Google, and that I am the custodian of the attached records consisting of

_____ (pages/CDs/kilobytes). I further state that:

a.    all records attached to this certificate were made at or near the time of

the occurrence of the matter set forth, by, or from information transmitted by, a

person with knowledge of those matters;

b.    such records were kept in the ordinary course of a regularly conducted

business activity of Google; and

c.    such records were made by Google as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the

Federal Rules of Evidence.

_____

Date

_____

Signature

AUSA: John J. McCormack, IV          Telephone: (202) 262-7011
Special Agent:     Steve Warren       Telephone:  (313) 300-4419

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the
Eastern District of Michigan

| In the Matter of the Search of | ) | Case: 2:20-mc-50281 |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Judge: Lawson, David M. Filed: 02-20-2020 |
| INFORMATION ASSOCIATED WITH EMILOUWS@GMAIL.COM, THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE, LLC | ) ) ) ) | IN RE:SEALED MATTER(SW)(MLW) |

Case No.

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Northern _____ District of _____ California _____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before    March 4, 2020 _____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      February 20, 2020    11:00 am _____

_____
*Judge's signature*

City and state: _____

Hon. Anthony P. Patti     U. S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| **Certification** |
|---|

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*